The decree of the district court will be affirmed.

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Titus THOMAS, aka Tee, Defendant-
Appellant.**

**No. 73–1403.**

United States Court of Appeals,
Fifth Circuit.

Dec. 19, 1973.

Rehearing and Rehearing En Banc
Denied Jan. 22, 1974.

Robert Glass, New Orleans, La., for defendant-appellant.

Gerald Gallinghouse, U. S. Atty., Mary Williams Cazalas, Asst. U. S. Atty., New Orleans La., for plaintiff-appellee.

Before TUTTLE, BELL and GOLD-BERG, Circuit Judges.

TUTTLE, Circuit Judge:

This case primarily concerns the extent to which misrepresentations in affidavits by Government agents vitiate the search warrant issued pursuant thereto. Appellant Titus Thomas, a/k/a Tee, was convicted of possession of 128.46 grams of heroin, a Schedule I narcotic drug substance, in violation of 21 U.S.C. § 841(a)(1). This appeal seeks reversal on three grounds: (1) that the admitted misrepresentations in the affidavit by agent Phillips should vitiate the search warrant; (2) that the search conducted at night was illegal; and (3) that the arrest and search incident thereto were invalid. We readily find no merit in the latter two contentions, but determine that this case presents substantial questions regarding the standards for evaluating affidavits containing misrepresentations.

However, careful consideration causes us to hold that this affidavit, purged of the factual errors, is sufficient to support the search warrant because (1) the misrepresentations were not intentionally [1] made and (2) if unintentionally committed, the misrepresentations were not material to the showing of probable cause.

## I.  FACTS

The facts are undisputed. On May 8, 1972, agent Phillips of the Bureau of Narcotics and Dangerous Drugs made the following affidavit in support of his application for a search warrant:

"According to two reliable informants hereto referred to as Source 1 and Source 2 [both informants have furnished intelligence in the past that has led to the arrest and seizures of her-

oin] James H. FINLEY is a heroin trafficker. Source 1 supplied intelligence on September 20, 1971, that FINLEY conferred with him and at this time FINLEY stated that he was supplying numerous southern cities and that he wanted to expand his operations to include New Orleans.

"At this time FINLEY advised Source 1 that he would supply him with large quantities of heroin in the near future. FINLEY was driving a 1971 Lincoln bearing Alabama license 2A15335. The vehicle was registered to him at 470 East Ridge Road, Mobile, Ala.

"On Monday, May 1, 1972 Source 1 advised Affiant that FINLEY was in New Orleans and that FINLEY had sent an unknown male to him to advise him that FINLEY had a supply of heroin and could supply him with as much heroin as he wanted. Source 1 attempted to get in touch with FINLEY with negative results.

"On Sunday, May 7, 1972 Source 2 called Affiant and states that he had met earlier in the day with FINLEY and that FINLEY was residing at 2116 Iberville Street . . . Source 2 stated that he went to 2116 Iberville Street and talked with FINLEY about selling drugs for him. Source 2 told FINLEY that he was too afraid to do it. FINLEY explained to the source that he had rented an apartment across the street at 2117 Iberville and that he was keeping his cache at that location. FINLEY stated that he had to package some heroin and at this time he took Source 2 to the apartment [as described below]. The Source related that FINLEY lifted the bed in the apartment and removed a small suitcase and removed numerous packages. Source 2 then advised he left the apartment and told FINLEY that he was afraid of being caught by the police.

---

I.  For the purpose of this opinion we use the word "intentional" as meaning "with intent to deceive the magistrate." Of course, Phil-lips intended to use the name "Finley." In that sense, his incorrect statement was intentional.

"On Sunday, May 7, 1972 at approximately 6:00 PM Affiant placed the premises of 2116 and 2117 under surveillance. At approximately 7:45 PM Affiant observed an unknown Negro male exit 2116 Iberville, go across the street to the door between 2115 and 2117 Iberville, use a key and enter the door. In approximately three minutes the unknown Negro male exited the premises and walked to the corner of Galvez Street and turned out of affiants' vision. In approximately five minutes the unknown Negro re-appeared and walked back and entered 2116 Iberville Street.

"WHEREFORE Affiant respectfully requests . . . that a nighttime warrant pursuant to section 509 of the Controlled Substances Act . . . be issued because of the need to search at the next most reasonable opportunity and because in my experience as a narcotics investigator drugs are likely to be more open for delivery and dealing at night and thus more exposed to seizure under a search warrant."

The name, "James H. Finley" was capitalized as shown in the above recital. At the hearing on the motion to suppress, agent Phillips admitted that the informants mentioned in the affidavit did not designate the party discussed by the name of "James H. Finley," but consistently referred to him as "Tee" during each conversation with Phillips. It was Phillips' testimony that he, not the informants, as stated in the affidavit ascribed the name "James H. Finley" to the party discussed by the informants based on certain deductions after additional investigation. The affidavit, however, clearly states that the informants avowed that "James H. Finley" had shown source 2 the narcotics and had solicited both sources 1 and 2 as salesmen.

Source 1 had related to Phillip that "Tee" met him in a 1971 Lincoln with an Alabama license tag 2A15335. Agent Phillips discovered through further investigation that this 1971 Lincoln had been associated in the Bureau of Narcotics and Dangerous Drugs Office in Mobile, Alabama with heroin traffic and was registered to "James H. Finley." Phillips deduced that "Tee" was "James H. Finley" and used this name in the affidavit. Phillips did not learn that the man arrested was the appellant Titus Thomas who was the same person known as "Tee" until after appellant's arrest.

Agent Phillips obtained the search warrant around 8:00 or 9:00 p. m. on May 8, 1972. The search warrant was executed shortly thereafter, at approximately 10:00 p. m., at 2115–2117 Iberville Street, New Orleans, Louisiana, by agents Phillips, Costa and Curry. The landlady furnished these officers a key to 2117 after they showed her the search warrant; heroin was found both under the bed and in a locked suitcase. After seizing the contraband the officers proceeded to an area directly across from the premises searched and observed the front of 2116 Iberville Street. The landlady stated that Dickinson and Titus Thomas were the occupants of the apartment, and described Thomas as fifty years old, with receding hair, graying mustache, bright skin, heavy set and about six feet tall. While waiting across the street the agents observed Dickinson enter the apartment with a woman. After approximately ten or fifteen minutes, Dickinson, Thomas and two women left 2116 Iberville, and proceeded down the sidewalk. They stood for a moment or two; it appeared that they were going to separate; the women began to leave. The officers arrested Thomas and Dickinson as they were stepping off the curb on the side of the street opposite them at 2117 Iberville. The keys in Thomas' pocket fit the suitcase and the door to 2117 Iberville where the heroin had been located.

Phillips did not state to the magistrate his reason for believing "Tee"'s name was "James H. Finley." Phillips had assumed that "Finley" and "Tee" were the same persons since September of 1971, the time the circumstances concerning the automobile occurred. Also, both informants had stated that "Tee" was from Mobile, Alabama, the resi-

dence of "Finley." The record does not reflect the specific physical description the two informants gave to Phillips of the persons they separately referred to as "Tee," but Phillips testified that the description of the person he was investigating was:

> "He was brown skinned, 45 years old. He would have had short hair, heavyset, heavy build, 230, 240 pounds, black male."

Phillips had conducted a surveillance of 2116–2117 Iberville Street on the night prior to the issuance and execution of the search warrant on May 8, 1972. Phillips noted in the affidavit that on May 7, 1972, he observed a "Negro male" entering the apartment, but did not give any further description of this man. For these reasons, Phillips maintains that he did not intentionally misstate the facts in the affidavit prepared on May 8, 1972, because he believed "Tee" to be "Finley."

The trial court found that Phillips maintained a good faith belief based upon his investigation that "Tee" was in reality a man named "Finley." The erroneous theory of "Tee" 's true identity was deemed trivial and insignificant as regarding the magistrate's determination of probable cause. The court upheld the nighttime search and did not discuss the validity of the arrest.

## II. MISREPRESENTATION IN AFFIDAVITS

The vast majority of decisions resolving attacks on the sufficiency of affidavits underlying search warrants are reached on the assumption that the affiant's statements are true. But how is a court to deal with a defense attack on the veracity of statements made by the affiant or other government agents?

This Court's task is twofold: (1) to determine what standards should be applied in evaluating the validity of affidavits containing misrepresentations; and (2) to consider whether this affidavit passes muster under those standards.[2]

In United States v. Upshaw, 448 F.2d 1218 (5th Cir. 1971) and in two recent cases, United States v. Jones, 475 F.2d 723 (5th Cir. 1973) and United States v. Morris, 477 F.2d 657 (5th Cir. 1973), this Court had occasion to consider "misrepresentative" affidavits supporting search warrants. These decisions determined that after deleting the erroneous statements, the affidavits were totally lacking in facts tending to show the requisite probable cause, and thus held the search warrants pursuant thereto invalid. In United States v. Upshaw, *supra*, 448 F.2d at 1218, 1222, appear the following pertinent comments:

> "Purged of its erroneous statements, the affidavit was wholly lacking in facts tending to show that Davis was printing checks or identification documents or that any of the documents were on the premises of the print shop. Stripped of its incorrect assertions, the affidavit became like that in Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933), consisting of nothing more than the bare statement of affiant's belief and cause to suspect that items were in a specified location. Mere affirmance of belief or suspicion is not enough.
>
> *Id.* at 47, 54 S.Ct. at 13, 78 L.Ed. at 162. *See also* Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).
>
> "Once it came to the attention of the court, from the testimony at the mo-

2. At this juncture it is important to emphasize that this case does not raise the issue of whether a defendant is entitled to a hearing to test the underlying factual validity of the affidavit on the basis of which a warrant has been issued. This question is yet to be resolved by the Supreme Court, and none of the Fifth Circuit cases heretofore concerning misrepresentative search warrants presented the question. *See* United States v. Morris, 477 F.2d 657, 662 n. 3 (5th Cir. 1973); United States v. Jones, 475 F.2d 723, 726 (5th Cir. 1973); United States v. Upshaw, 448 F.2d 1218, 1221–1222 n. 3 (5th Cir. 1971).

tion to suppress hearing, that evidence had been seized on the basis of statements of facts erroneously made by the affiant which struck at the heart of the affidavit's showing of probable cause, the court was required to grant the motion [to suppress] . . ."

Moreover, this Court in United States v. Morris, *supra*, 477 F.2d at 662, aptly summarized the rationale for suppressing evidence obtained due to erroneous affidavits:

> "A contrary rule would leave the warrant requirement embodied in the fourth amendment open to circumvention by overzealous officials willing to make erroneous affidavits in the hope that the resultant search or arrest will yield conclusive proof of criminal conduct. The warrant procedure operates on the assumption that statements in the affidavit presented to the issuing magistrate are at least an accurate representation of what the affiant knows though possibly inadequate to show probable cause. It would quickly deteriorate into a meaningless formality were we to approve searches or arrests based upon misrepresentation or incorrect factual statements. Thus when an affidavit contains inaccurate statements which materially affect its showing of probable cause, any warrant based upon it is rendered invalid."

In this trio of cases this Court adopted the bifurcated procedure of excising the misrepresentative parts from the affidavit and then examining the residue for probable cause.

The difference with this case is that after purging this affidavit of its misrepresentations, probable cause for issuance of a search warrant still exists, even if the affidavit is viewed in the light most favorable to the appellant-defendant. If the consistent use of the name "Finley" were deleted, there would be nothing to link sources 1 and 2, and the information from sources 1 and 2 must satisfy probable cause requirements independent of each other.

Source 1 could not conceivably alone constitute sufficient probable cause. Accordingly, this Court must evaluate what is left in source 2, after eliminating source 1 and all the misrepresentations in source 2. Even if we accept this view, sufficient probable cause remains in source 2 alone. The non-misrepresentative residue in source 2 discloses that: "X" met source 2 at 2116 Iberville Street; that "X" asked source 2 to sell heroin; that "X" said he was keeping a cache in his apartment which he showed source 2. Additionally Phillips had substantiated the reliability of the source, stating that he had furnished intelligence in the past. Thus, the affidavit complies with the well-established two-prong test for assaying affiants' hearsay statements in that: (1) the affidavit presents sufficient objective evidence to enable the magistrate to conclude that the unnamed informant is credible or that his information is reliable, and (2) the affidavit sets forth some underlying circumstances which reveal the source of the informer's information pertaining to the criminal activity. *See* Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

Therefore, this case presents the issue, which this Court has not heretofore squarely faced: How is a misrepresentative affidavit to be treated when after deleting the false material, there remain facts which might have supported a magistrate's finding of probable cause?

■■ The crucial question becomes whether, after deletion of the errors, surveying the non-misrepresentative residue for probable cause is the only standard to be applied in evaluating the effect of inaccurate affidavits supporting search warrants. We conclude not, in light of the fact that courts of several other circuits have adopted additional tests, and more importantly, this Court sounded the following significant caveat in a footnote in United States v. Morris, *supra*, 477 F.2d at 662 n. 6.

"We feel compelled to emphasize that there is nothing in the record which indicates that the erroneous statement in Williams' affidavit was intentionally or willfully made. Nothing in this opinion is intended to suggest to the contrary."

This comment appears to intimate that whether the misrepresentation was "intentional" or "willful" may affect in some circumstances the validity of the affidavit. Also, the district court in the instant case based its decision upholding the sufficiency of this affidavit not only on the fact that the name error was insignificant and not integral to a showing of probable cause, but also because the affidavit was made in good faith. The district court held:

"In the present case, Phillips maintained a good faith belief, based upon his experience in law enforcement and upon his investigation of narcotics cases, that 'Tee' was in reality a man named 'Finley.' The Court finds no *willful attempt to deceive* the magistrate, and it is clear that Phillips' erroneous theory of 'Tee''s real identity was trivial and insignificant as regard the magistrate's determination that there was probable cause requisite to the issuance of a search warrant. . . ." (Emphasis supplied).

Therefore, we hold that affidavits containing misrepresentations are invalid if the error (1) was committed with an intent to deceive the magistrate, whether or not the error is material to the showing of probable cause; or (2) made non-intentionally, but the erroneous statement is material to the establishment of probable cause for the search.

This standard of evaluating the intent of the agent-affiant is supported by decisions in other circuits. A recent opinion by the Court of Appeals for the Seventh Circuit in United States v. Carmichael, 7 Cir., 489 F.2d 983 [1973] extensively examined inaccurate affidavits supporting search warrants. First, although the Supreme Court has not de-

cided the extent to which a court may permit an attack on a warrant where the allegations of the affidavit establish probable cause, the Seventh Circuit significantly held criminal defendants are entitled to a hearing under the following circumstances:

". . . in United States v. Pearce, 7th Cir., 275 F.2d 318, 321–322 (1960), this Court expressed its opinion in dicta that the propriety of such a hearing 'is hardly open to question.' * * *

"We now hold that a defendant is entitled to a hearing which delves below the surface of a facially sufficient affidavit if he has made an initial showing of either of the following: (1) any misrepresentation by the government agent of a material fact, or (2) an intentional misrepresentation by the government agent, whether or not material. See generally United States v. Dunnings, 425 F.2d 836, 840, 2d Cir. 1969, certiorari denied, 397 U. S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412; United States v. Halsey, 257 F. Supp. 1002 (S.D.N.Y.1966); Kipperman, 'Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence,' 84 Harv.L.Rev. 825 (1971)." [3]

After determining that in certain circumstances a defendant was entitled to a hearing on the factual validity of an affidavit supporting a search warrant, the court proceeded to set the standards under which evidence would be suppressed:

"However, once such hearing is granted, more must be shown to suppress the evidence. Evidence should not be suppressed unless the trial court finds that the government agent was either recklessly or intentionally untruthful. A completely innocent misrepresentation is not sufficient for two reasons. Most importantly, the primary justification for the exclusionary rule is to deter police misconduct (see Kipperman supra at 831, and cases cited), and good faith errors cannot be de-

---

3. However, note footnote 2 *supra*.

terred. Furthermore, such errors do not negate probable cause. If an agent reasonably believes facts which on their face indicate that a crime has probably been committed, then even if mistaken, he has probable cause to believe that a crime has been committed. Such errors are likelier and more tolerable during the early stages of the criminal process, for issuance of a warrant is not equivalent to conviction.

"Negligent misrepresentations are theoretically deterable, but no workable test suggests itself for determining whether an officer was negligent or completely innocent in not checking the facts further. We therefore concluded that evidence should not be suppressed unless the officer was at least reckless in his misrepresentation. Even where the officer is reckless, if the misrepresentation is immaterial, it did not affect the issuance of the warrant and there is no justification for suppressing the evidence. Arguably, the same conclusion could be reached as to deliberate but immaterial misrepresentations. However, we conclude that if deliberate government perjury should ever be shown, the court need not inquire as to the materiality of the perjury. The fullest deterrent sanctions of the exclusionary rule should be applied to such serious and deliberate government wrongdoing."

This discussion by the court substantially adopts, with one modification, the standards for evaluating affidavits set forth in Kipperman, "Inaccurate Search Warrant Affidavits As A Ground For Suppressing Evidence," 84 Harv.L.Rev. 825, 830–33 (1971). In short, the author proposes that evidence should be suppressed when there is either (1) an intentional misstatement by an affiant-agent, whether material or immaterial to showing probable cause; or (2) a negligent or unreasonable assertion in an affidavit, if material to showing probable cause, but *not* where (3) the mistake is innocent, even if material to probable cause. The only modification to Kipper-

man's analysis made by the Seventh Circuit was that mere ordinary negligence is not sufficient, for the misrepresentation must amount to recklessness.

Two other decisions are noteworthy. In United States v. Bowling, 351 F.2d 236, 421–422 (6th Cir. 1965), the Court of Appeals for the Sixth Circuit upheld a search warrant based on an affidavit containing factual errors, stating:

"Under this circumstance, we read the denial of the motion to suppress evidence as a holding that there was probable cause for the warrant and that errors in the affidavit were immaterial or unintentional,[2] such as are produced by drafting 'by non-lawyers in the midst and haste of a criminal investigation.' United States v. Ventresca, *supra,* 380 U.S. at 108, 85 S.Ct. at 746."

The Court of Appeals for the Eighth Circuit also briefly considered the effect of misrepresentations in affidavits in United States v. Bridges, 419 F.2d 963, 966–967 (8th Cir. 1969), where the defendant argued, for the first time on appeal, that the government agent falsely swore that the defendant had been convicted in 1961 for "narcotics violations and received a sentence of nine years." Treating this contention in a footnote, the court dismissed the issue by pointing out that there was no showing in the record that the agent made the statement with "fraudulent intent" and that the error was "immaterial" since it was highly unlikely that any weight would be given a 1961 conviction for narcotics addiction in determining probable cause for the issuance of a search warrant in 1968. These two decisions by no means thoroughly considered the issue, but did inject the element of intent as a possible standard for evaluating the effect of misrepresentations in affidavits.

Other cases discussing inaccurate search affidavits have generally involved situations where, after deletion of the misrepresentations, the affidavit is clearly lacking in probable cause. *See* United States v. Harwood, 470 F.2d

322, 324–325 (10th Cir. 1972); United States v. Roth, 391 F.2d 507, 511 (7th Cir. 1967); United States v. Botsch, 364 F.2d 542, 546 (2d Cir. 1966), cert. denied, 386 U.S. 937, 87 S.Ct. 959, 17 L. Ed.2d 810 (1967); United States v. Pearce, 275 F.2d 318 (7th Cir. 1960); United States v. Henderson, 17 F.R.D. 1 (D.D.C.1954). The Seventh and Fourth Circuits have also held that the willful or intentional use of a fictitious name as the affiant's signature on a search warrant affidavit, intentional use of a fictitious name as the affiant's signature on a search warrant affidavit *per se* voids the warrant. United States ex rel. Pugh v. Pate, 401 F.2d 6 (7th Cir. 1968)' and King v. United States, 282 F. 2d 398 (4th Cir. 1960).

Without further citation of authority we are convinced that there would be a sufficient basis for invalidating a search warrant if the error was intentional, even though immaterial to the showing of probable cause. In fact, a warrant issued following an intentional misstatement of fact by an affiant-agent would present the clearest case for suppression. Kipperman's reasoning is worth repeating:

> "This would be a clear case of proscribed government action (perjury) which could be to some degree deterred by quashing warrants based thereupon. One could analogize intentional inaccuracy by the affiant to the knowing use of perjured testimony at trial and hold that the public policy against government distortion requires automatic suppression of the evidence obtained in such a manner regardless of prejudice. Thus an intentional misstatement of fact in the affidavit would be fatal even if it were immaterial to proving probable cause, of if, unbeknownst to the lying affiant, the facts alleged in bad faith turned out to be true." Kipperman, *supra*, at 831.

invalidating warrants pursuant to intentional misrepresentations by government agents is a logical corollary of the deterrence philosophy underlying the exclusionary rule.

Therefore, the next step is to determine whether Phillips' misrepresentations were intentional or unintentional.[4] If unintentional, we have already concluded that the error was not material to the showing of probable cause, and therefore would not provide a basis for quashing the warrant.[5] However, if the error was intentionally committed, the materiality of the error to the establishment of probable cause is not a prerequisite to invalidating the warrant.

Foremost, it should be emphasized that the statements regarding the name "James H. Finley" were clearly misrepresentative; the only open question is whether the misrepresentation was in good faith or with an intent to mislead. Phillips may have in good faith deduced from his investigation about the license tag of the 1971 Lincoln that "Tee" was "James H. Finley." However, Phillips drafted the affidavit so artfully that it appeared that these informers had called the party in question "Finley," and not that Phillips had merely deduced that "Tee" must be "Finley." Phillips did not state the mental processes he followed to make this deduction, which he easily could have done. The use of the name "Finley" also made it appear that sources 1 and 2 were conclusively referring to the same person. The consistent use of the name Finley tied these informant tips together: at sixteen places the name "Finley" is capitalized, thus emphasizing the correctness of the investigation about this person. The error was blantantly misrepresentative.

However, the saving feature is that through his investigation Phillips had secured the license tag number from the informants, discovered the car was registered to James H. Finley; he knew

---

4. See footnote 1 *supra*.

5. It should be emphasized that we do not reach the question of what degrees of unintentional misrepresentations, i. e., reckless or negligent or innocent, are necessary to invalidate an affidavit, since in any event the error in the instant case was immaterial.

that both "Tee" and "James H. Finley" were from Mobile, Alabama, and consequently had a valid basis for assuming that "Tee" was "James H. Finley." Although the issue is a difficult one, we feel compelled to affirm the district court's finding that the agent's belief was made in good faith and not with an intent to deceive the magistrate in this case.

In conclusion, we determine that the affidavit, purged of its errors, sufficiently supports the search warrant issued pursuant thereto because the misrepresentations (1) were not intentional, or (2) were not material to the showing of probable cause.

### III. THE NIGHTTIME SEARCH

■ The search warrant was executed around 10:00 p. m., May 8, 1972. The warrant itself was a blank form filled in by the magistrate. At the beginning the form provided for the name of the affiant, and "That he (has reason to believe) (is positive) that . . ." probable cause to search the named premises exists. These alternative parentheticals were footnoted to a paragraph in the warrant which recited,

> "The Federal Rules of Criminal Procedure provide: 'The warrant shall direct that it be served in the daytime, but if the affidavits *are positive* that the property is on the person or in the place to be searched, the warrant may direct that it be served at any time.' Rule 41(c)." (Emphasis supplied).

In the warrant issued by the magistrate, the parenthetical "is positive" was crossed out. All agreed that the trial court correctly held that Federal Rules of Criminal Procedure 41(c) could not authorize this night search, because the affiant was not positive that the contraband was at the place to be searched.

However, the provisions of the Federal Rules of Criminal Procedure 41(h) state:

> "This rule does not modify any act, inconsistent with it, regulating search, seizure and the issuance and execution

of search warrants in circumstances for which special provision is made. . . . The term 'daytime' is used in this rule to mean the hours from 6:00 a. m. to 10:00 p. m. according to local time. . . ."

The trial court held that this night search was proper under 21 U.S.C. § 879, because such act fell within the exception as allowed in Federal Rules of Criminal Procedure 41(h). It is provided in 21 U.S.C. § 879 that:

> "(a) A search warrant relating to offenses involving controlled substances may be served at any time of the day or night *if* the judge or United States magistrate issuing the warrant *is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time.*" (Emphasis supplied).

The appellant's contention is that the italicized words require the magistrate to make an affirmative statement on the face of the warrant showing his satisfaction that probable cause existed to believe that the search was necessary at night. It is noted that before the command to search, the warrant recited,

> "I am satisfied that there is probable cause to believe that the property so described is being concealed on the (premises) above described and that the foregoing grounds for application for issuance of a search warrant exist."

The warrant concluded with the command,

> "You are hereby commanded to search forthwith the (place) named for the property specified, serving this warrant and making the search (in 'the daytime) (at any time in the day or night) . . . ."

The parenthetical "in the daytime" was crossed out. Thus, the appellant stresses that this warrant only stated the magistrate's satisfaction with the showing of probable cause to search and commanded that the warrant be served "at any time in the day or night," but failed to include any statement by the magis-

trate that he was satisfied that there was probable cause for the execution of the warrant specifically at night. The appellant basically argues that the magistrate was required to state on the face of the warrant why he was authorizing the night search, without citing any case law to substantiate the position that more should have been done by the magistrate..

The government responds that section 879(a) requires only a determination by the magistrate that the night search was necessary, without demanding explanation on the warrant itself or the reasons therefore. It is stressed that Phillips on the last page of the warrant application stated adequate reasons for needing a night search:

"It is also requested that a nighttime warrant pursuant to section 509 of the Controlled Substances Act, (P.L. 91–513) be issued because of the need to search at the next most reasonable opportunity and because in my experience as a narcotics investigator drugs are more likely to be open for delivery and dealing at night and thus more exposed to seizure under a search warrant."

Furthermore, it is asserted that the magistrate by the act of crossing out the section of the form "in the daytime" evidenced his finding of probable cause for a nighttime search and was not required to include statements on the face of the warrant specifically regarding the night element of the search.

The resolution of this issue is assisted by examining the prior law regarding federal narcotics search warrants, 18 U.S.C. § 1405(1) [6], which was superseded by 21 U.S.C., § 879(a). Section 1405(1) provided, in pertinent part, that a:

". . . Search warrant [relating to narcotics offenses] may be served at any time of the day or night if the judge or United States Commissioner issuing the warrant is satisfied that there is probable cause to believe that the grounds for the application exist."

Section 1405(1) was uniformly interpreted to require *only* a showing of probable cause to search in order for a warrant relating to narcotics to be executed at night. In other words, if the warrant could legally issue, it could be served at any time, day or night. United States v. Stallings, 413 F.2d 200, 207 (7th Cir.), cert. denied, 396 U.S. 972, 90 S.Ct. 460, 24 L.Ed.2d 440 (1969); United States v. Pittman, 439 F.2d 906, 909 (5th Cir. 1971); United States v. Tucker, 262 F.Supp. 305 (S.D.N.Y.1966). The appellant contends that the new narcotics search warrant provision, 21 U.S.C. § 879(a), is significantly different because the judge must not only be satisfied that there is probable cause to believe that grounds exist for the warrant, but also "for its service at such time." This language, argues appellant, is a new requirement, commanding affirmative action by the magistrate and probable cause to issue the warrant specifically at night.

This argument would be plausible, were it not for the fact that the legislative history of 21 U.S.C. § 879 reveals that no change was intended in application or meaning of section 1405(1) with the enactment of section 879(a). Indeed, the House Report notes that:

"Subsection (a) of this section [21 U.S.C. § 879] incorporates 18 U.S.C. § 1405 and authorizes service of a search warrant at any time of the day or night if probable cause has been established to the satisfaction of the judge or U.S. Magistrate issuing the warrant." [7]

---

6. Act of 18 July, 1956, ch. 629, Title II, § 201, 70 Stat. 573, repealed by Pub.L. No. 91–513, Title III, § 1101(b)(1)(A), 84 Stat. 1292 (1970).

7. H.R.Rep. No. 91–1444 (Part I), 91st Cong., 2d Sess. 54 (1970). See U.S.Code Cong.Adm.News, 91st Cong., 2d Sess., at pp. 4621–4622 (1970). Exactly the same language is contained in the Senate Report. S.R.P. No. 91–613, 91st Cong., 1st Sess. 30–31 (1969).

A recent decision by the Court of Appeals for the District of Columbia, United States v. Gooding, 155 U.S.App.D.C. 259, 477 F.2d 428, 432–439 (1973), extensively considered these two statutes, reviewing their legislative history and previous interpretations of section 1405(1). In the opinion of the Court, section 879(a) was a "direct descendant" of section 1405(1) and did not require a special showing of a need to search at night. *Id.* at 432–438. *See* United States v. Thomas, 294 A.2d 164 (D.C.App.1972).

In conclusion, it is significant that agent Phillips did affirmatively state adequate reasons for conducting the search at night, since it was necessary to search immediately and the warrant was obtained at 8:00 p. m. Consequently, we are not required to determine whether specific reasons for searching at night must be given in addition to the general· showing of probable cause. We only hold that where the magistrate did cross out "daytime" and did have an explanation in the affidavit adequately justifying the nighttime search, the magistrate was not required to repeat or further elucidate the special grounds for issuing the search at night on the warrant itself. Accordingly, the search warrant was properly issued and executed at night.

## IV. LEGALITY OF THE ARREST

The trial court did not reach the legality of the arrest, because it ruled that the prior warrant seizures · were legal and thus led to the valid arrest. The appellant claims that the search warrant was illegal, therefore the arrest was illegal. Moreover, if the arrest was illegal, the taking of the keys from appellant was illegal. However, since this Court concludes that the search warrant was legal, this issue is pretermitted.

The judgment is affirmed.